IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KRISTEN GIOVANNI *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE NAVY, <br><br> *Defendant*. | CIVIL ACTION <br> No. 16-4873 |

**PAPPERT, J.**                                                                                      July 6, 2017
<u>**MEMORANDUM**</u>

Since 2003, the Giovannis have lived in close proximity to the Naval Air Station Joint Reserve Base Willow Grove and the Naval Air Warfare Center Warminster. After discovering that chemicals from the naval facilities infiltrated their water supply, and concerned that they are at a higher risk of developing illnesses as a result of this contamination, the Giovannis sued the United States Department of the Navy in state court under Pennsylvania's Hazardous Sites Cleanup Act. They seek an injunction requiring the Navy to provide "medical monitoring," a health assessment, a health effects study and blood testing.

The Navy removed the case pursuant to 28 U.S.C. § 1442(a)(1) and filed a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The Willow Grove and Warminster facilities are subjects of an ongoing response action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Because the Giovannis's lawsuit is a "challenge" to a "removal or remedial action" under CERCLA, the Court lacks jurisdiction to hear their claims and accordingly grants the Navy's motion.

1

## I.

### A.

Kristen and Charles Giovanni are the parents of Anthony and two minor children, V.G. and D.G. (Compl., at 1, ECF No. 1-1.) The Giovannis have lived adjacent to the Navy's Willow Grove facility, where a private well located on the Giovannis's property supplied their water, since December 2003. (*Id.* ¶¶ 24–25.)

In December 2014, the Giovannis discovered dangerous levels of perfluorochemical compounds ("PFCs") in their water supply. (*Id.* ¶ 26.) They later learned that the facilities at Willow Grove and Warminster had improperly disposed of contaminants and hazardous substances, allowing them to enter the groundwater supply. (*Id.* ¶ 1.) The EPA has listed both facilities on its National Priorities List for over two decades. (*Id.* ¶ 22.) In other words, there is an ongoing clean-up action at these facilities under CERCLA. *See* 42 U.S.C. § 9601 *et seq*. The Navy provided the family with bottled water for six months, after which time the family used their local township's water supply. (*Id.* ¶¶ 31–32.) Contamination from the Willow Grove facility also impacted the township's water supply and the Giovannis were exposed to unsafe levels of PFCs from both sources of water. (*Id.* ¶¶ 34–36.)

### B.

On August 23, 2016, the Giovannis sued the Navy in the Montgomery County Court of Common Pleas under Pennsylvania's Hazardous Sites Cleanup Act ("HSCA"). The Navy filed a notice of removal pursuant to 28 U.S.C. § 1442(a)(1) on September 12, 2016, (ECF No. 1), and the Giovannis filed a motion to remand on October 11, 2016, (ECF No. 7).

In their motion to remand, the Giovannis argued that CERCLA divested the district court of jurisdiction because the case was brought under state law and 42 U.S.C. § 9613(h) bars "'pre-enforcement review' of remedial and recovery actions." (Pls.' Mot. to Remand, at 6, ECF No. 7-1.)  They explained that since their "claims are being brought pursuant to Pennsylvania state law only" and the "EPA's response to the contamination resulting from the Willow Grove Facility is ongoing," they have "brought a pre-enforcement claim arising under state law and the Court is divested of jurisdiction of their HSCA claim." (*Id.*)

The Navy responded to the Giovannis's motion to remand and simultaneously filed a motion to dismiss for lack of subject matter jurisdiction.  (ECF No. 8.)  The Navy agreed with the Giovannis that § 9613(h) precluded the district court from exercising jurisdiction over the Giovannis's claims.  The Navy argued, however, that CERCLA also barred the claims in state court and that the Navy had sovereign immunity.[1]  The Navy moved to dismiss the case under Rule 12(b)(1) rather than remand pursuant to 28 U.S.C. § 1447(c).

The Giovannis responded to the Navy's motion, (ECF No. 13), claiming again that the Court lacked subject matter jurisdiction.  They contended that remand under § 1447(c) was proper and that the Court should not allow the Navy to use a "clever procedural two-step whereby parties . . . create limited jurisdiction for the sole purpose of dismissing the action." (Pls.' Memo. in Op. to Def.'s Mot. to Dismiss, at 3, ECF No. 13 (quoting *Northrop Grumman Tech. Serv., Inc. v. DynCorp Int'l LLC*, No. 1:16-cv-534, 2016 WL 3144330, at *6 (E.D. Va. June 6, 2016).)  The Giovannis also raised—for the

---

[1] Because the Court agrees with the Navy's first argument that it lacks subject matter jurisdiction over the Giovannis's claims, *see infra* Part II, the Court need not address the Navy's immunity argument.

3

first time—an alternative argument: their Complaint did not "challenge" a "removal or remedial action" under § 9613(h) so the Court *did* have jurisdiction to hear their claims. (*Id.* at 8–11.) The Giovannis's latter argument directly contradicted their initial position.

The Court held oral argument on both motions on February 6, 2017. (ECF Nos. 17 & 18.) During argument, the Giovannis withdrew their motion to remand and focused primarily on their newly raised position—that their suit was not a challenge to a removal or remedial action. (Tr. of Hr'g, at 7:4–7, ECF No. 18.) Because the parties had not squarely briefed the most important issues remaining in the case, the Court ordered supplemental briefing on two questions: (1) whether a state law medical monitoring claim is a "challenge" to a "removal or remedial action" and is therefore barred by 42 U.S.C. § 9613(h); and (2) if the Court lacks subject matter jurisdiction, whether the case should be remanded to the state court pursuant to 28 U.S.C. § 1447(c) or dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). (ECF No. 19.) The parties filed their supplemental briefs on March 31, 2017. (ECF Nos. 20 & 21.)

## II.

### A.

CERCLA is a "comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). There are two types of clean-up actions under CERCLA: remedial actions and removal actions. Remedial actions are "generally long-term or permanent containment or disposal programs" while

4

removal actions are "typically short-term cleanup arrangements." *Schaefer v. Town of Victor*, 457 F.3d 188, 196 (2d Cir. 2006) (citation and quotation omitted).

CERCLA defines "remedial action" as:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to . . . *any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment*. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that . . . such relocation is more cost-effective than and environmentally preferable . . . or may otherwise be necessary to *protect the public health or welfare*. . . .

42 U.S.C. § 9601(24) (emphasis added).

CERCLA broadly defines "removal" in part as:

> the cleanup or removal of released hazardous substances from the environment . . . [and] such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to *prevent, minimize, or mitigate damage to the public health* or welfare or to the environment, which may otherwise result from a release or threat of release. . . .

*Id.* § 9601(23) (emphasis added).

CERCLA also contains both jurisdictional and timing provisions. With two exceptions, "the United States district courts shall have exclusive original jurisdiction over all controversies arising under [CERCLA]." *Id.* § 9613(b). One of these exceptions, subtitled "[t]iming of review," restricts jurisdiction while a removal or remedial action is ongoing: "[n]o Federal court shall have jurisdiction under Federal law . . . or under

5

State law . . . to review any *challenges* to removal or remedial action." *Id.* § 9613(h) (emphasis added).[2]

CERCLA does not define "challenges." The Third Circuit Court of Appeals has explained, however, that "removal and remedial actions are designed to deal with situations involving grave and immediate danger to the public welfare." *Clinton Cty. Comm'rs v. E.P.A.*, 116 F.3d 1018, 1025 (3d Cir. 1997) (en banc). Thus, in enacting § 9613(h), Congress sought to "prevent judicial interference, however well-intentioned, from *hindering* EPA's efforts to promptly remediate sites that present significant danger to public health and the environment." *Id.* at 1023 (emphasis added). Indeed, "CERCLA's language shows Congress concluded that disputes about who is responsible for a hazardous site, what measures actually are necessary to clean-up the site and remove the hazard or who is responsible for its costs should be dealt with after the site has been cleaned up." *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1019 (3d Cir. 1991). Congress believed such challenges "posed a greater risk to the public welfare than the risk of EPA error in the selection of methods of remediation." *Clinton*, 116 F.3d at 1025. Section 9613(h) therefore "deprives" a district court of the power to hear claims under "any" statute that "would interfere with EPA's clean-up activities on a Superfund site."[3] *Boarhead Corp.*, 923 F.2d at 1024.

---

[2]  Section 9613(h) itself has five exceptions. *See* 42 U.S.C. § 9613(h)(1)–(5). Both parties agree that no exception applies here. *See infra* at Section III.A for a detailed discussion on the interaction between § 9613(b) and (h).

[3]  "A Superfund site is a site which the United States Environmental Protection Agency has added to its Superfund list, also known as the National Priorities List." *Huggins v. Prince George's County*, 683 F.3d 525, 529 (4th Cir. 2012); *see also McManaway v. KBR, Inc.*, 852 F.3d 444, 453 n.10 (5th Cir. 2017); *United States v. Gen. Elec. Co.*, 670 F.3d 377, 381 n.3 (1st Cir. 2012).

6

Other Circuits have also applied a "broad standard for what constitutes a challenge" under § 9613(h). *Cannon v. Gates*, 538 F.3d 1328, 1336 (10th Cir. 2008). They have explained, among other things, that lawsuits that call into question a removal plan, interfere with the implementation of a CERCLA remedy, seek to dictate specific remedial actions or seek to improve on the CERCLA cleanup are "challenges" barred by § 9613(h).[4]

**B.**

The Giovannis seek an order requiring the Navy to: (1) provide medical monitoring[5] for Plaintiffs and their minor children; and (2) perform a health assessment and a health effects study "including, but not limited to, blood testing for both themselves and other individuals exposed to the contamination and pollution of public and private water sources with PFCs." (Compl. ¶¶ 2, 64 & 65.) The Giovannis criticize the EPA, claiming that Agency oversight has "failed to prevent ongoing PFC

---

[4]  *See, e.g.*, *Cannon*, 538 F.3d at 1335 (citing *New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1249 (10th Cir. 2006)) ("A lawsuit challenges a removal action if it 'calls into question [that removal] plan.'"); *Broward Gardens Tenants Ass'n v. EPA*, 311 F.3d 1066, 1072 (11th Cir. 2002) (A lawsuit challenges a remedial action if it "interferes with the implementation of a CERCLA remedy" because "the relief requested will impact the remedial action selected."); *ARCO Envtl. Remediation, LLC v. Dep't of Health and Envtl. Quality of Mont.*, 213 F.3d 1108, 1115 (9th Cir. 2000) (explaining that state law actions "challenge" CERCLA cleanups where "the plaintiff seeks to dictate specific remedial actions" or to "alter the method and order of cleanup"); *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 330 (9th Cir. 1995) (explaining that a lawsuit constitutes a "challenge" when it creates "the kind of interference with the cleanup plan that Congress sought to avoid or delay by the enactment of Section 113(h)" or when in "all practical purposes, [it] seeks to improve on the CERCLA cleanup"); *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239 (9th Cir. 1995) ("An action constitutes a challenge if it is related to the goals of the cleanup."); *see also El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 880 (D.C. Cir. 2014) (collecting cases).

[5]  "Medical monitoring [wa]s one of a growing number of non-traditional torts that ha[d] developed in the common law to compensate plaintiffs who have been exposed to various toxic substances." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 849 (3d Cir. 1990). Under Pennsylvania law, medical monitoring is available as a common law tort claim and as a claim under HSCA. The elements of both claims are identical. *See Redland Soccer Club, Inc. v. Dep't of the Army*, 696 A.2d 137, 143 (Pa. 1997).

7

use and disposal at the Facilities[,] . . . failed to prevent and abate contamination and migration of . . . toxic contaminants to local public and private drinking water sources[,] . . . failed to prevent and abate drinking water contamination . . . [and] failed to prevent ingestion and bioaccumulation of PFCs by the local population." (*Id.* ¶ 22.) According to the Giovannis, EPA oversight has been a "decades-long failure[ ]." (*Id.* ¶ 23.)

The Giovannis's suit is, under CERCLA's plain language, a challenge to a removal or remedial action under § 9613(h). The definition of removal includes "actions . . . necessary to *prevent, minimize, or mitigate damage to the public health*." 42 U.S.C. § 9601(23) (emphasis added). Remedial actions include "any *monitoring* . . . required to . . . protect the *public health*." *Id.* § 9601(24) (emphasis added). Since assessing the effects on public health is an integral part of implementing a remedial action, the Giovannis's suit—which seeks injunctive relief to compel medical monitoring and a health effects study—challenges a removal or remedial action and is barred by § 9613(h).[6]

---

[6] In fact, Congress created a separate agency, the Agency for Toxic Substances and Disease Registry ("ATSDR"), to "effectuate and implement [CERCLA's] health related authorities." 42 U.S.C. § 9604(i)(1). "Among those authorities is a requirement that the ATSDR complete a 'health assessment' within one year of an EPA proposal to list a site on the [National Priorities List]." *Hanford Downwinders Coalition, Inc. v. Dowdle*, 71 F.3d 1469, 1474 (9th Cir. 1995) (citing 42 U.S.C. § 9604(i)(6)(A)). "The purpose of the health assessment is to help determine 'whether actions . . . should be taken to reduce human exposure to hazardous substances from a facility and whether additional information on human exposure and associated health risks is needed and should be acquired by conducting epidemiological studies . . . , establishing a health surveillance program . . . , or through other means.'" *Id.* (quoting 42 U.S.C. § 9604(i)(6)(G)). "Only if the ATSDR Administrator determines that 'there is a significant increased risk of adverse health effects in humans from exposure to hazardous substances based on the results of a health assessment' must the ATSDR initiate a health surveillance program." *Id.* at 1474–75. (quoting 42 U.S.C. § 9604(i)(9)). "Once initiated, the program must include both periodic medical testing to screen the exposed population for disease and a mechanism to refer for treatment anyone who needs medical attention. *Id.* at 1475 (citing 42 U.S.C. § 9604(i)(9)(A), (B)).

Requiring the Navy to pay for medical monitoring and conduct a health effects study would also "interfere" with the ongoing "clean-up activities," *Boarhead Corp.*, 923 F.2d at 1024, because ordering this remedy would necessarily entail deciding a "dispute[ ] about who is responsible for [the] hazardous site," *id.* at 1019, and "who is responsible for its costs," *id.* These are decisions that Congress determined "should be dealt with after the site has been cleaned up." *Id.*; *see* (Tr. of Hr'g, at 42:8–13 (Plaintiffs' acknowledgement at oral argument that a liability determination would be necessary before relief could be granted)); *see also Redland Soccer Club, Inc. v. Dep't of Army*, 801 F. Supp. 1432, 1435 (M.D. Pa. 1992) (holding § 9613(h) barred plaintiffs' medical monitoring claims under HSCA).

## C.

The Giovannis rely on three decisions to support their position that state law medical monitoring claims do not constitute "challenges" under § 9613(h). *See Durfey v. E.I. DuPont De Nemours & Co.*, 59 F.3d 121 (9th Cir. 1995); *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993); *Stepp v. Monsanto Research Corp.*, No. C-3-91-468, 1993 WL 1367349 (S.D. Ohio Sept. 30, 1993). Additional background on CERCLA's structure is necessary in order to understand this argument.

Under CERCLA, "[t]he Federal Government may clean up a contaminated area itself, see [§ 9604], or it may compel responsible parties to perform the cleanup, see [§ 9606(a)]." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 161 (2004). "In either case, the Government may recover response costs," *id.*, from potentially responsible persons for "all costs of removal or remedial action incurred by the United States Government," *id.* (quoting 42 U.S.C. § 9607(a)(4)(A)). Section 9607 also provides

9

"a cause of action for private parties to seek recovery of cleanup costs," *Key Tronic Corp.*, 511 U.S. at 818, because potentially responsible persons are liable for "any other necessary costs of response incurred by *any other person*," 42 U.S.C. § 9607(a)(4)(B) (emphasis added). Thus, under § 9607, the Government or a private party can sue to recover its costs. *See Schaefer*, 457 F.3d at 195. Funds spent on medical monitoring, however, are not recoverable as response costs under CERCLA. *See Price v. U.S. Navy*, 39 F.3d 1011, 1016–17 (9th Cir. 1994); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1533 (10th Cir. 1992).

*Durfey*, *Yslava*, and *Stepp* reason that since medical monitoring is not a recoverable response cost under CERCLA, and because CERCLA defines "response" to include removal and remedial actions, medical monitoring cannot be a removal or remedial action. Since medical monitoring is not a removal or a remedial action, it therefore cannot "challenge" a removal or remedial action and is thus not barred by § 9613(h).

This argument is flawed because it assumes that "response costs" and "response" mean the same thing under CERCLA. They do not. Response is defined under the statute: "[t]he terms 'respond' or 'response' means remove, removal, remedy, and remedial action; all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25). "Cost" or "response cost" is not defined. *Cf. Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 849 (3d Cir. 1995) ("The absence of a definition of 'response costs' has been the source of much litigation since CERCLA's enactment."). As a result, the argument falsely equates "response costs" with "removal or remedial actions." All "removal and

remedial actions" are "responses" under CERCLA's statutory definition, *see* 42 U.S.C. § 9601(25), but not "response costs."  It therefore does not follow that all "response costs" are necessarily "removal and remedial actions."  *Id*.

Additionally, *Durfey*, *Yslava* and *Stepp*'s conclusion conflicts with the overarching purpose of § 9613(h), discussed above.  These cases never explain why state law medical monitoring claims are not "disputes about who is responsible" that "should be dealt with after the site has been cleaned up."  *Boarhead*, 923 F.2d at 1019.  Nor do they explain why allowing such claims to proceed does not constitute "judicial interference" which would "hinder[ ] EPA's efforts to promptly remediate sites." *Clinton*, 116 F.3d at 1025.  Indeed, the *Durfey* court acknowledged that "one of the goals" of a cleanup is "establishing the effects on and dangers to human health" posed by the CERCLA site.  59 F.3d at 126.  Yet it quickly dismissed this point, concluding that it did not "read this as directly related to the goal of monitoring individuals with a demonstrated increased risk of injury."  *Id.*  In the twenty-two years since *Durfey* was decided, no other circuit court has adopted its reasoning.

### III.

### A.

Section 9613(b) provides that "[e]xcept as provided in subsections (a) and (h) . . . the United States district courts shall have exclusive original jurisdiction over all controversies arising under [CERCLA]."  42 U.S.C. § 9613(b). Section 9613(h), subtitled "[t]iming of review," strips federal courts of jurisdiction to review "any

11

challenges to removal or remedial action."[7] *Id.* § 9613(h); *see also supra* Part II. Again, § 9613(h) prevents judicial interference from hindering EPA's clean-up efforts, *Clinton*, 116 F.3d at 1025, and ensures that disputes over CERCLA removal or remedial actions, including who is responsible for their costs, are "dealt with after the site has been cleaned up," *Boarhead Corp.*, 923 F.2d at 1019.

Together, § 9613(b) and (h) divest state courts of jurisdiction to review any challenges to a removal or remedial action. *Fort Ord Toxics Project, Inc. v. California E.P.A.*, 189 F.3d 828, 832 (9th Cir. 1999); *N. Penn Water Auth. v. Bae Sys.*, No. 04-5030, 2005 WL 1279091, at *10 (E.D. Pa. May 25, 2005). "[B]ecause Congress enacted [§ 9613(h)] in order to promote the swift execution of CERLCA cleanups, Congressional intent is best effectuated by reading [§ 9613(b)'s] exclusive jurisdiction provision to cover any challenge to a CERCLA cleanup." *N. Penn Water Auth.*, 2005 WL 1279091, at *10 (quoting *Fort Ord*, 189 F.3d at 832) (internal quotations omitted)); *see also O'Neal v. Dep't of Army of U.S.*, 742 A.2d 1095, 1100 (Pa. Super. Ct. 1999) ("The right of enforcement of state law based on medical monitoring remedies is clearly a 'controversy' within the broad terms of CERCLA jurisdiction." (citing 42 U.S.C. § 9613(b))). *But see United States v. Colorado*, 990 F.2d 1565, 1579 (10th Cir. 1993).[8]

---

[7] Section 9613(a) provides that review of regulations promulgated under CERCLA shall be made in the Circuit Court of Appeals of the United States for the District of Columbia. 42 U.S.C. § 9613(a).

[8] In *United States v. Colorado*, the state of Colorado sought to enforce its EPA-delegated authority under the Resource Conservation and Recovery Act ("RCRA") against the United States Army. 990 F.2d 1565, 1574 (10th Cir. 1993). The Army contended that this enforcement was a "challenge" to a removal or remedial action barred by CERCLA's timing provision, 42 U.S.C. § 9613(h). *Id.* The Tenth Circuit Court of Appeals ruled for the state of Colorado, holding that "an action by Colorado to enforce the final amended compliance order, issued pursuant to its EPA-delegated RCRA authority, is not a 'challenge' to the Army's CERCLA response action." *Id.* at 1575.

After concluding that § 9613(h) did not bar Colorado's enforcement action, in dictum, the court remarked that "[e]ven if an action by Colorado to enforce the final amended compliance order

12

The Giovannis contend that § 9613(h) only divests federal courts of jurisdiction. (Pls.' Br., at 5, ECF No. 13.)  Indeed, § 9613(h) provides that "no *federal court* shall have jurisdiction . . . to review any challenges to removal or remedial action[s]." 42 U.S.C. § 9613(h).  Section 9613(h) cannot, however, be read in isolation.  In interpreting statutes, courts are "guided not by a single sentence or member of a sentence, but [should] look[ ] to the provisions of the whole law, and to its object and policy." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 94–95 (1993) (quotation omitted); *cf. Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation.  The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental cannon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

Section 9613(b) and (h) must be read *in pari materia*.  "Congress only removed *federal* court jurisdiction from 'challenges' to CERCLA cleanups because only federal courts shall have jurisdiction to adjudicate a 'challenge' to a CERCLA cleanup in the first place." *Fort Ord*, 189 F.3d at 832.  Congress would not have barred challenges to removal or remedial actions in federal court only to allow unfettered litigation in state

---

would be a "challenge" to the Army's CERCLA response action, the plain language of § 9613(h) would only bar a federal court from exercising jurisdiction over Colorado's action." This dictum must be read in context. *Colorado* arose under vastly different circumstances: the state of Colorado sought to enforce its EPA-delegated authority under RCRA, it did not involve private plaintiffs. The Third Circuit has distinguished and limited the reach of *Colorado*. *See Clinton Cty Comm'rs v. E.P.A.*, 116 F.3d 1018, 1027–1027 n.5 (3d Cir. 1997) (en banc) (holding that RCRA-based suits challenging CERCLA activities are precluded under § 9613(h)).

courts. Indeed, Congress' purpose in enacting § 9613(h) "could be thwarted just as easily by allowing state courts to issue injunctions halting CERCLA cleanups." *Id.* at 832. Section 9613(h) must be read in context with § 9613(b)'s broad language: § 9613(h), "by postponing the jurisdiction of federal courts, postpones jurisdiction over CERCLA challenges from the only courts that have jurisdiction to hear such challenges." *Id.*

**B.**

Because the state court lacked jurisdiction, the Court must dismiss the case under the doctrine of derivative jurisdiction. "The derivative jurisdiction doctrine arises from the theory that a federal court's jurisdiction over a removed case derives from the jurisdiction of the state court from which the case originated. *Palmer v. City Nat. Bank of W. Va.*, 498 F.3d 236, 244 (4th Cir. 2007). "If the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none, although it might in a like suit originally brought there have had jurisdiction." *Lambert Run Coal Co. v. Balt. & Ohio R.R. Co.*, 258 U.S. 377, 382 (1922); *see also Minnesota v. United States*, 305 U.S. 382, 389 (1939).

In 1985, Congress amended the general removal statute and abrogated derivative jurisdiction with respect to those cases removed under § 1441. *See* Judicial Improvements Act of 1985, Pub. L. No. 99-336, § 3, 100 Stat. 633, 637 (1986); *see also Palmer*, 498 F.3d at 245. Congress, however, did not amend § 1442—thus courts largely agree that derivative jurisdiction still applies to cases removed under § 1442. *See, e.g.*, *Rodas v. Seidlin*, 656 F.3d 610, 623–24 (7th Cir. 2011); *Palmer*, 498 F.3d at 245; *Selvaggio v. Horner*, 42 F. Supp. 3d 732, 733–34 (E.D. Pa. 2014) (Bartle, J.); *see*

*also Calhoun v. Murray*, 507 F. App'x 251, 256 (3d Cir. 2012). *But see North Dakota v. Fredericks*, 940 F.2d 333, 337 (8th Cir. 1991) ("[T]he policy of Congress underlying new § 1441(e) supports the complete abandonment of the derivative-jurisdiction theory, even though the words of the statute clearly do not reach this far.").[9]

Derivative jurisdiction applies here because the Navy removed this case pursuant to § 1442(a)(1). Because the state court lacked jurisdiction, *see supra* Section III.A, the case must be dismissed. *Palmer*, 498 F.3d at 239, 249 (affirming district court's grant of a federal defendant's motion to dismiss after case was removed under § 1442); *Selvaggio*, 42 F. Supp. 3d at 735 (granting the United States' motion to dismiss after case was removed under § 1442).

An appropriate order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[9] In *Palmer*, the Fourth Circuit explained that whether the Eighth Circuit in *Fredericks* correctly interpreted the 1985 congressional amendments to § 1441 "is academic" because later amendments to the statute in 2002 made clear that the abrogation of derivative jurisdiction applied only to those actions removed under § 1441. *Palmer*, 498 F.3d at 245; *see also* 14B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 3d § 3721, at 192 (2007 Supp.) ("[N]ew § 1441(f) limits the abrogation of the derivative jurisdiction doctrine to cases removed under 28 U.S.C. § 1441.").

15